MYRTLE HAUGH, Appellee, v. HATTIE LANZ et al., Appellants.

**REFORMATION OF INSTRUMENTS:** Evidence—Weight and Suf-
1 ficiency. Evidence reviewed, and held not to be clear and con-
vincing that a first mortgage was intended.

**REFORMATION OF INSTRUMENTS:** Grounds—Tender of Per-
2 formance Before Suit. A vendor may not maintain a suit for
reformation of a contract to provide for annual interest, where
the purchaser has tendered notes providing for such payment.

**REFORMATION OF INSTRUMENTS:** Evidence—Weight and Suf-
3 ficiency. Evidence reviewed, in an action to reform a contract
of sale of land so as to provide that the mortgage to be given
as part of purchase price by the purchaser should be a *first*
mortgage, and held not to make the necessary clear and satis-
factory showing that a first mortgage was intended.

**QUIETING TITLE:** Oral Agreement to Sell—Husband's Agreement
4 as to Wife's Property—Estoppel—Specific Performance. Where
a husband took part in the negotiations in which his wife alone
signed a contract for the sale of real property, and he orally
agreed to the sale, and, in reliance upon his conduct and prom-
ises, the purchasers made the contract and paid the first year's
interest due on mortgage to be given for purchase price, the
purchasers are entitled to a decree in their favor against the
wife and her husband, requiring them to specifically perform
their contract, or that title to said land be quieted in the pur-
chasers as against them.

LADD, C. J., PRESTON and SALINGER, JJ., dissent.

*Appeal from Jasper District Court.*—JOHN F. TALBOTT,
Judge.

MAY 14, 1919.

REHEARING DENIED NOVEMBER 15, 1919.

PLAINTIFF's action is to reform a certain written in-
strument. Defendants answer, denying plaintiff's right to
a reformation, and on cross-petition ask that the instru-
ment be enforced specifically. Opinion states the facts.

This action was before this court at a former sitting,

and an opinion filed. Upon petition, a rehearing was grant-
ed, the case was reargued, and again submitted to this
court, for further consideration. The majority hold to the
opinion as formerly written, Chief Justice Ladd and Jus-
tices Preston and Salinger now dissenting.—*Reversed in
part; affirmed in part.*

*Ross R. Mowry* and *E. M. S. McLaughlin,* for appel-
lants.

*Bray, Shifflett & Wilkie,* for appellees.

GAYNOR, J.—This action was begun by the plaintiff,
Myrtle Haugh, to reform a certain written instrument, en-
tered into between her and the defendants. The defendants
appeared, and filed answer and cross-petition, making the
husband of Myrtle Haugh a party. In their answer, de-
fendants deny the right of plaintiff to a reformation of the
written contract, and in a cross-petition, pray for the en-
forcement of the contract as made, against the plaintiff and
her husband. The relationship of the parties is a material
matter. The plaintiff is the daughter of one Herman Lanz.
The defendant Hattie Lanz is his widow. Defendants Her-
man and Colen Lanz are his sons. His estate is valued at
about $21,000. The defendants, Herman, Colen, and the
widow, desire to purchase the interests of all the heirs.
They have purchased the interest of all the others, and paid
to each $3,100. They then entered into this written con-
tract with Myrtle Haugh, to purchase her interest at the
same figure. This is the contract which Myrtle Haugh, the
plaintiff, asked to have reformed, and this is the contract
which the defendants wish to have enforced. It provides
that the plaintiff, Myrtle Haugh, shall take, in full settle-
ment of her interest in her father's estate, and the defend-
ants shall pay her therefor, the sum of $3,100, to be secured
by a mortgage on the Clem Starrett 80, to be executed and

delivered on the 1st day of March, 1914, said $3,100 to be payable on or before 5 years from that date, and to draw 5 per cent interest from March 1, 1914; that, upon the signing of this contract, plaintiff shall sign a deed conveying all her interest in the real and personal property of her father, Herman Lanz, to the defendants; and that, upon the execution of this instrument, it shall evidence an indebtedness of $3,100 from the defendants to the plaintiff.

Plaintiff prays to have this written contract reformed, so as to conform to what she claims to be the real contract entered into between her and the defendants, and she asks to have it reformed so as to make the interest payable annually, and to provide that the mortgage be a first mortgage upon the Starrett land. A decree was entered, dismissing plaintiff's petition and defendants' cross-petition. Both parties appeal. Defendants, having first appealed, are denominated appellants.

We will dispose of plaintiff's appeal first, and this may be thus disposed of:

The contract, having been reduced to writing, is presumed to contain the agreement of the parties, and if she would have it speak other than it does, she must satisfy the court, by clear and satisfactory evidence, that the writing does not contain the true contract entered into between the parties. We are satisfied, from an examination of the record, that she has not done this. The contract was written as the parties had talked, prior to the writing. There was no mistake or fraud in its making. It expressed just what the parties then intended it should express, no more and no less. They recorded in the instrument just what they intended the writing should say. The parties were all familiar with the situation. They knew and understood just what the contract was, that they had entered into, and what obligations they assumed in the

1. REFORMATION OF INSTRUMENTS: evidence: weight and sufficiency.

contract. This is manifest from the interpretation which has been placed upon the contract by the parties themselves. It appears that she has tendered to the defendants a deed to her interest in her father's estate, in fulfillment of the contract, and the defendants have tendered her a mortgage, with interest payable annually, according to the tenor and effect of this promissory note, providing for the payment of interest annually. So it appears that defendants have undertaken to, and offered to, and desired to, execute their part of the agreement in accordance with the contention of the plaintiff, and have tendered performance to her by executing to her a note, with interest payable annually, and a mortgage to secure the same, according to the terms of the contract, with interest as stipulated in the note.

Her claim that the contract should provide for a first mortgage is not only disproven by a preponderance of the oral testimony, but is negatived by the facts and circumstances disclosed in the record. She practically concedes that a second mortgage is ample security to her for the payment of the $3,100, and also that she knew, at the time the writing was executed, that there was already a mortgage upon the premises. This is a circumstance negativing her claim that the contract in this respect should read other than it does. She executed a quitclaim deed to the defendants, without demanding a reformation of the contract, and defendants have tendered to her a note and mortgage, with provision for interest as urged by her.

It appears that defendants, before the commencement of this action, were ready, able, and willing to perform the contract on their part in accordance with the contention of

the plaintiff, and have tendered her a note

**2. REFORMATION OF INSTRUMENTS: grounds: tender of performance before suit.** and mortgage, with interest payable annually. There is no occasion for the interposition of equity upon this contention of the plaintiff's. The note and mortgage were executed on the 1st day of March, 1914. The suit was not commenced until the 29th day of April, 1914. On the 6th day of March, 1915, defendants paid the plaintiff the first year's interest, $155, and this was accepted and retained by her as a payment made in part fulfillment of the contract which she seeks to reform.

As has been frequently said by this court, the evidence that justifies the reformation of a written contract must be clear and satisfactory. Written instruments entered into

**3. REFORMATION OF INSTRUMENTS: evidence: weight and sufficiency.** between parties are not to be lightly set aside or changed, and never should be unless the evidence is clear and convincing. It has been said by this court that a contract will not be reformed in equity where neither party intended that any different words should be used from those which were employed. To reform a writing on the ground of mistake, it must appear that there is a mistake in the writing, and the evidence to show this must be clear, satisfactory, and free from reasonable doubt. More than a mere preponderance of the evidence is required to sustain a decree for the reformation of a written instrument. It has further been said that a court will not disturb the provisions of a written agreement unless there is clear and convincing evidence that the instrument does not set forth the true intent of the parties, and that the failure to make it express such intent arose from oversight, or mistake in drafting. The general rule seems to be that the proof necessary must be almost sufficient to establish the right to a reformation beyond a reasonable doubt.

We think the court did not err in refusing to reform the contract, and in dismissing plaintiff's petition.

This brings us to a consideration of defendants' cross-petition. This presents more difficulty, and the disposition of the matter involves us in a difference of opinion. The controversy upon this issue centers upon **4. QUIETING TITLE: oral agreement to sell: husband's agreement as to wife's property: estoppel: specific performance.** the plaintiff's husband, Charlie Haugh. He did not sign the written contract in controversy. The defendants claim, however, that the husband, Charlie, was present, and assisted the plaintiff in all matters pertaining to the making of the contract, and encouraged the execution thereof, and, as an inducement to these defendants to enter into the contract with Myrtle, said, among other things:

"I will sign a quitclaim deed when the note and mortgage are executed and delivered to her."

The defendants pray in their cross-petition that he and plaintiff and each of them be forever barred and estopped from claiming any title, right, or interest in the real estate covered by the contract. They further pray for a specific performance on the part of both plaintiff and her husband, and that defendants' title in said real estate be established and confirmed against the claims of each.

The rule contended for by defendants was applied in *Lanz v. Schumann,* 175 Iowa 542. The plaintiffs in that case are the defendants in this. One of the defendants in that case was the daughter of Herman Lanz, and the other, her husband. In that case, as in this, Mrs. Schumann, the daughter, undertook to convey to the mother and the two brothers her interest in her father's estate. Mrs. Schumann entered into a written agreement to do so, which was not signed by her husband. In that case, Mrs. Schumann and her husband were parties defendant. The relief prayed was that the title be quieted and confirmed in the plaintiffs,

against both the husband and wife. Schumann refused to perform on his part. In that case, it was said:

"If he (Schumann) was present  *  *  *  taking part in the negotiations for the purchase, and agreed to the sale at the stated price, and plaintiffs, relying upon his conduct and his promises, made the settlement and turned over the agreed consideration, he cannot escape specific performance simply because his name is not subscribed with the other grantors to the written instrument. To thus hold him does not, as counsel seem to think, involve any departure from the rule which makes incompetent proof of oral agreements to vary or alter a written contract. Mr. Schumann is not a party to the writing, and he cannot avail himself of its protection in this respect. It is only a party to a writing who can use it as a screen to shut out oral evidence of the actual agreement."

In the *Schumann* case, as in this, it was claimed that the contract was partly oral and partly in writing.

In *Meylink v. Rhea*, 123 Iowa 310, the court dealt with a situation somewhat similar to that before us now. In that case, the defendant was the owner of a farm. It was claimed by the plaintiffs that he entered into an oral contract to sell the farm to the plaintiffs, and agreed to convey to the plaintiffs the land at $59 an acre; that, at the time of the agreement, plaintiffs paid the defendant, on the consideration, the sum of $10. Defendant's wife was made a party to an action to require the defendant to specifically perform his contract. The defendant denied the making of the contract, and pleaded other defenses, which are not material to be considered here. The wife appeared, and denied the agreement, denied all knowledge that any money had been paid to her husband on account of the agreement, and objected to any decree requiring her to specifically perform on her part, or to join in the execution. In that case, it appeared that the negotiations for the sale were made at

the home; that both husband and wife took part in the ne-
gotiations. This court said, in passing upon the case, that
the trial court was warranted in finding that Mrs. Rhea,
equally with the husband, was desirous of making the sale,
the only question of difference being the price to be paid per
acre; that she was fully advised of the offer made by the
plaintiffs; that, in the presence of the plaintiffs, she told
her husband to go ahead and make the sale on such terms
as he thought best.

"Accepting such to be the facts, it cannot be important
that she was not personally present when her husband
finally consented to the sale, and received the money in part
payment of the purchase price. Having authorized her hus-
band to act in the premises, we think she should be bound
by his agreement."

What does the record show here, touching Charlie
Haugh?

The plaintiff, Myrtle Haugh, testifies:

"After I signed the contract, my husband and I talked
the matter over [meaning the sale of her interest in her
father's land to these defendants], *and in the month of June
he agreed to sign it.* I was disposing of my interest in my
father's estate for $3,100. The reason my husband would
not sign the quitclaim deed was that my mother called him
a thief. I signed and acknowledged a quitclaim deed, just
after the contract was signed. The contract was made in
June. At the conversation in March, my husband was say-
ing what he was going to do with the money; and my moth-
er said it wasn't his money, it was my money; and my hus-
band got mad. I knew, at the time, that my other sister
and her husband had signed a quitclaim deed, and received
$3,100. At the March meeting, when the matter was talked
of, they offered to give me 20 acres off the Clem Starrett
place for a quitclaim deed from me to my interest in my
father's estate. I agreed to that. My husband did not say

much about it. Mr. McLaughlin, the lawyer, made out a contract for that. My husband did not stay very long after we came to the contract. My husband wanted the contract to show where the land should be. My mother insulted him, and he left. He was not in Mr. McLaughlin's office any more that day. He made out the contract for the 20 acres and gave it to me; told me to show it to my husband, and there was something said about signing it and sending it back. I did not sign that contract. This transaction was the second week in March. The contract in question was made in June,—the contract in which I should receive the $3,100. One time, my brother and another came to see me in December. They stayed until night, and then saw my husband. We all talked the matter over. My husband then said that they would have to pay the money for the expenses if we signed it. My husband said he would not sign it, referring to a quitclaim deed. That was in December after the contract was made. The matter of signing the deed was discussed with my husband. I got the contract for the 20 acres after my husband and I had talked the matter over with my mother and brothers. After this paper was made out for the 20 acres, my husband and I agreed to release our interest in the estate, and they were to give us 20 acres of land. This was after the other girls had signed the deed."

Charlie Haugh testified:

"I was present at the conference in March. While I was there, I had a conversation with the defendants. We talked over the matters of the estate. They estimated the estate at $21,000, to be divided between seven. This would be about $3,100 to each one. They offered 20 acres of land, or $3,100 in the form of a mortgage. There was no mention of a deed whatever. *I was doing business for my wife at that time, and was selling her interest for $3,100.* I had no interest to sell. I never agreed to sign any papers. I said

I had enough to look after my own things. I told my wife she could sign the agreement to take the $3,100 if she wanted to. I told the defendants that I would not sign the deed for her interest in the estate. This was in March. I was willing that she should sell her interest for $3,100, if they would do their part. I told them at the time that we would take 20 acres of land, or $3,100. I was willing to agree to that if she would take it, but I said I would not sign the deed myself."

It is apparent from the testimony of the plaintiffs that Charlie was perfectly willing to sell his wife's interest in the estate to these defendants for $3,100, and that he gave the defendants to understand that he consented to her doing so; and the only ground upon which he claims that he refused was that his mother-in-law insulted him by telling him that it was his wife's money, and not his, and that he had nothing to do with it. Giving to plaintiff's testimony the most favorable coloring, it shows that the husband recognized that $3,100 was the full value of his wife's interest in the land, and was willing and anxious that his wife should sell her interest in this estate for $3,100; that he gave these defendants to understand that he consented to anything that she might do in the way of disposing of her interest; that his refusal simply was to sign the papers, because of his hostility to his mother-in-law.

We have not attempted to set out all the plaintiff's testimony, but enough to show the mental attitude of the defendant Charlie towards the situation, towards the action his wife contemplated taking in the disposition of her interest in her father's estate, and what was contemplated by the defendants in the purchase of that interest. We gather from this testimony that the value of Myrtle's interest in the estate did not exceed $3,100; that it was their purpose to convey to these defendants the interest of Myrtle, unembarrassed by any claim of her husband, for $3,100. The

rupture between the husband and the mother-in-law grew out of some statements made by the husband touching the disposition by him of the proceeds of the sale when the sale was consummated. The defendant widow seemed to have been a kinder mother than she was a mother-in-law, and informed him, in perhaps not uncertain language, that the proceeds belonged to her daughter, and not to him. At this he took offense, and, though never objecting to the consummation of the deal between these defendants and the wife, —indeed, we may say, encouraging the wife to the consummation of the deal,—he, because of the words of his mother-in-law, spoken, perhaps, offensively, declared his purpose to have nothing to do with the sale, and, if we take the plaintiff's testimony as a basis for the thought, refused to join in any written evidence of the sale. If we turn, however, to the defendants' testimony, we find an entirely different state of facts; but, before going into this branch of the case, we might say that the contract entered into between Myrtle and the defendants bound the defendants to pay her $3,100 in five years from the 1st of March, 1914, and to secure the payment by mortgage upon certain land. At the end of the first year, the defendants recognized this obligation, paid Myrtle the first year's interest, $155, and prepared and tendered to her a mortgage, as required by the contract, and further than that, offered to pay her the full amount of $3,100, if she desired.

Without setting out the defendants' testimony in full, we may say that it shows that the husband said, in conversation, at some time during the negotiations, that he would sign a quitclaim deed for his dower interest in the property covered by the contract, and said that whatever Myrtle did in the way of disposing of her interest in her father's estate would be all right, so far as he was concerned. This conversation, however, we take it, was had at the March meeting, and at the time when the rupture befell between the

mother-in-law and Charlie; but we find further that, at the
time the contract was signed, Myrtle informed these de-
fendants that her husband, Charlie, was busy, and could
not be present with her at the time of the signing of the
contract, but would come later and execute it. Of course,
she denies that she said this; but we are persuaded, from
all her conduct, that she was as well satisfied as these plain-
tiffs that her husband would join in the contract, for she
says that, after she signed the contract on the 21st of
June:

"I talked the matter over with my husband .[meaning
the sale of her interest in her father's estate] in the month
of June, and he agreed to sign the contract."

He was then informed by his wife that the contract
had been signed by her, and he agreed to join with her in
the contract; and this shows his mental attitude at that
time. His subsequent contumacious refusal to do what he
had agreed to do, and join in the contract, was simply sug-
gested by his avarice, and desire to hold up these defend-
ants for more than he had agreed should be paid as a con-
sideration for her interest.

It is true that, in one place in his testimony, he says:
"I always had an intention to claim an interest in my wife's
property." If this be so, his whole conduct belied his in-
tention, and his intention, so concealed, was a palpable
fraud upon these defendants. But we are not dealing with
his secret intentions. We are dealing with what was said
and done. By this, the rights of the parties are to be
judged.

We think the record justifies us in saying that Charlie
was willing to take the 20 acres offered Myrtle at the March
meeting or $3,100, but preferred the $3,100, because, as he
says, he could invest that in Des Moines property, and re-
ceive good rentals. We think the fair inference from all
the testimony is that he was willing at all times that his

wife should convey her interest in her father's estate for
$3,100, and so gave the defendants to understand; that the
deal between Myrtle and the defendants was entered into
and the contract made upon the theory that he would con-
sent to all that she did in the way of disposing of her inter-
est to these defendants; and that it was never his thought
to claim any dower interest in the land, when the sale was
consummated by her; that he gave the defendants to so un-
derstand; that he gave the defendants to understand that
whatever she did would bind whatever interest he had in
the property, and that the consideration to be paid would
be in full of the interest of both in the estate. The call
made upon him in December, and the request there made to
join in the deed, were only for the better evidencing of the
rights of these defendants in the premises conveyed. He
did not then refuse to join in the deed, but exacted $300
more than the contract called for,—more than he had
agreed was the fair value of the property conveyed. We
think the record discloses, with sufficient certainty to jus-
tify us in saying it is a fact, that Myrtle told these defend-
ants, at the time she signed the contract, that her husband
would sign a deed for his dower interest. Hattie Lanz tes-
tified: "She said he was busy now, but that he would come
down, as soon as he had time, and sign the deed." Myrtle
testified that, when she returned home, after signing the
deed, she and her husband discussed the fact, and he then
said that he would sign the deed or the contract. The wit-
ness McLaughlin testified that, at the March meeting, both
were present; that both said they would sign a deed con-
veying all their interest in the estate. Charlie said he
would convey his dower interest. They both understood
that they would sell their interest for 20 acres or $3,100,
and both said they would sign a deed. They did not then
wish to determine which they would take. Charlie said
he would rather have $3,100, because he contemplated build-

ing houses in Des Moines, and they would make more out of the rentals of the houses than they would out of the 20 acres.

To summarize: The consideration for the property was agreed upon. It was satisfactory to both Haugh and his wife. He never expressed any dissatisfaction with the consideration to be paid to his wife for the property, before the execution of the contract in June. After the execution of the contract in June, he agreed to join with her in the deed or contract. In the June contract, the defendants bound themselves by the contract, in express terms, to pay to Myrtle (the wife) $3,100 for her interest in the estate. It was stipulated in the contract that the contract itself evidenced an indebtedness of $3,100 due from these defendants to Myrtle Haugh for this property. So far as she was concerned, the contract was an enforcible contract against her, and bound the defendants. They gave her a contract enforcible against them. There was, therefore, a consideration passing to her. It is true that, when she gave to them the deed in fulfillment of the contract, the deed was placed in the hands of another, awaiting the signature of the husband. His secret intent not to sign the deed was never revealed until long afterwards. The deed was delivered to the plaintiff's attorney, awaiting the promised signature of Charlie Haugh. The deal was not to be consummated until the 1st of March. On the 1st of March, the defendants paid to Myrtle, and she received and retained, the interest due upon the amount contracted to be paid. In the making of the June contract, defendants understood, and the contract was made in reliance upon an understanding, that the husband would join in the execution of the contract; and this understanding was brought about, fostered, and encouraged by the conduct of the husband. He had said to these defendants that what Myrtle did was all right with him. He had said to these defendants that he would join in any instru-

ment which she executed. The June contract was made in reliance upon these statements. His purpose and intent not to join were never manifested to these defendants or communicated to them in any way until after the contract was made. The contract bound the defendants and the wife, and was a good consideration, and bound the husband. He consented to the consideration agreed upon between the wife and the defendants. If he consented and agreed to part with his interest in the land in consideration of their undertaking to pay the wife the money stipulated in the contract, then the fact that these defendants bound themselves to pay this money to the wife, relying upon his promise, works a consideration, and binds him, and he cannot contumaciously refuse. The defendants are entitled at least to a decree quieting title in them, as prayed, against any claim now urged or hereafter urged by Charlie Haugh or his wife.

It will be noted that this action was begun by Myrtle Haugh to reform the contract in controversy. She and the defendants both recognized the contract as binding upon them, and we think Charlie Haugh, her husband, is now estopped from asserting that it is not binding upon him, so far as he had any interest in the property covered by the contract.

However, without going into details, it is sufficient to say that this record discloses to our satisfaction that the defendants have performed their part of the contract; that this case falls within the rule laid down in the *Meylink* and *Lanz* cases, supra, in which the doctrine is announced that, if the husband is present, taking part in the negotiations for the purchase, and agrees to the sale at a stated price, and the grantees, relying upon his conduct and his promise, make the purchase, and turn over the agreed consideration, he cannot escape specific performance simply because his name is not subscribed with that of the other grantor to

the written instrument; that, if he consents to this for a consideration to be paid to his wife, and the consideration is paid, or tendered to her, he is bound, and cannot contumaciously refuse to perform. The defendants, therefore, are entitled to the relief prayed, and a decree should have been entered in their favor against the plaintiff and her husband, requiring them to specifically perform their contract, or that the title in the land in question be quieted in these defendants as against the claims of either the plaintiff or her husband.

The case is, therefore, affirmed on plaintiff's appeal and reversed on defendants' appeal.—*Reversed in part; affirmed in part.*

WEAVER, EVANS, and STEVENS, JJ., concur.

LADD, C. J. (dissenting). In my opinion, the decree dismissing the defendants' cross-petition should be affirmed. Under Section 4625 of the Code:

"Except when otherwise specially provided, no evidence of the following enumerated contracts is competent, unless it be in writing and signed by the party charged or by his authorized agent: * * * 4. Those for the creation or transfer of any interest in lands, except leases for a term not exceeding one year."

Exceptions are specified in the next three sections (Code Sections 4626, 4627, 4628) none of which have any application save that declaring that the subdivision quoted does not apply "where the purchase money, or any portion thereof, has been received by the vendor."

In *Meylink v. Rhea,* 123 Iowa 310, the finding was summarized by the court, by saying:

"That the transaction took place at the home of defendants; that both defendants took part in the negotiations; and that the trial court was warranted in finding Mrs. Rhea, equally with her husband, was desirous of making a

sale, the only question of difference being the price to be paid per acre; that she was fully advised of the offer made by plaintiff for the land; and that, in the presence of plaintiff, she told her husband to go ahead and make the sale on such terms as he thought best."

The court then comments thereon, by saying that:

"Accepting such to be the facts, it cannot be important that she was not personally present when her husband finally consented to the sale and received the money in part payment of the purchase price. Having authorized her husband to act in the premises, we think she should be bound by his agreement."

This agreement was entered into in the state of South Dakota, the statutes of which declare such a contract invalid; and the court then proceeded to determine that the exception to the statute of frauds of this state applied. Otherwise, the decision rests solely upon the ground that the wife, through the agency of the husband, as well as the husband, entered into an oral agreement for the sale of the land; and as there was part payment, specific performance rightly was decreed.

In *Lanz v. Schumann,* 175 Iowa 542, the substituted petition alleged that Schumann, with others, "agreed to quitclaim their interests in the land to plaintiffs for a specified consideration, and that the agreed consideration was furnished. Stated otherwise, there was an oral agreement to the effect indicated, which agreement was reduced to writing with some of the grantors, but remained in parol with A. C. Schumann. Plaintiffs have performed their part, as have also the grantors signing the agreement, but A. C. Schumann refused to perform, on his part." The court said that:

"Wholly irrespective of the question whether there was any mistake in the written agreement or whether A. C. Schumann ever agreed to sign it, the case is clearly one in

which the plaintiffs are entitled to equitable relief against
him.   If he was present, as the demurrer admits, taking
part in the negotiations for the purchase, and agreed to the
sale at the stated price, and plaintiffs, relying upon his con-
duct and his promises, made the settlement and turned over
the agreed consideration, he cannot escape specific perform-
ance simply because his name is not subscribed with those
of the other grantors to the written instrument."

And it was held that, as he did not sign the written
agreement, his undertaking was in parol, and that, as the
consideration agreed upon by him and others had been paid
in pursuance of such parol undertaking, the plaintiff was
entitled to the relief prayed.   Manifestly, these decisions
were based on the exception contained in Section 4626 of
the Code, in effect providing that, if the consideration or
any part thereof has been paid in pursuance of an oral con-
tract of purchase, such contract may be established by parol
evidence.

In the case at bar, the written contract of June 12th
was between Mrs. Haugh and defendants.   Her husband
was not mentioned therein, nor did he sign it.   Defendants,
then, necessarily rely on an oral agreement by him to sell,
or to join his wife in selling, on which some consideration
has been paid, or in connection with which there is conduct
working an estoppel *in pais.*   I am unable to find from the
record that there was such an oral agreement, or that mon-
ey or other consideration was paid in pursuance of such a
contract, if entered into, or that Haugh has so conducted
himself as that he should not be permitted to deny having
so agreed.   Conceding that Haugh was present at the March
meeting, and indicated that he would join in a conveyance
of his wife's interest in this estate for a consideration satis-
factory to her, it appears that later he withdrew this.   He
seems to have said something in Mrs. Lanz' presence con-
cerning the support of his wife, when, assuming a mother-

in-law's prerogative, she remarked, "I guess Myrtle is supporting you;" or, as related by another, Haugh was talking about what he would do with the money, when she remarked it was not his money, but that of his wife. This offended him, and he immediately withdrew, and did not participate in negotiations thereafter. Both Haugh and his wife testified that the former, upon withdrawing, declared that he would have nothing further to do with the matter. This testimony was not contradicted, except indirectly by the statements of the three defendants that, in entering into the contract in June, they relied upon his promise to sign the conveyance. The trial court heard these witnesses, and, therefore, enjoyed superior advantages in passing upon their credibility; and I am of the opinion that its conclusion that the defendants were advised that Haugh had, in effect, withdrawn his promise ought not to be disturbed.

Negotiations were not resumed until Mrs. Haugh visited her mother in June, when the matter was again taken up, and resulted in the signing of a contract, whereby she agreed to take, in full settlement of her interest in the estate of her father, the sum of $3,100, to be paid as follows, to wit:

"First parties agree to execute to the second party a mortgage on the Clem Starrett 80 acres on the first day of March, 1914, payable on or before 5 years from said date and to draw 5 per cent interest from March 1, 1914; that, upon the signing of this contract, second party shall sign deed conveying all of her interest in said estate, real and personal, of the said Herman Lanz, to said first parties, and this contract shall, upon the signing thereof, evidence an indebtedness of $3,100 of the first parties to the second party, according to the terms set out above. Said mortgage to be in the amount of $3,100, and first parties may pay all or

any part of said sum at any time. Witness our hands this
21st day of June, 1913.

> "Hattie Lanz.
> "Herman W. Lanz.
> "Colen G. Lanz.     First parties.
> "Myrtle Haugh,     Second party."

It is to be observed that Haugh is not mentioned as a
party in this contract, nor does it stipulate that he shall
sign the quitclaim deed. Doubtless, Mrs. Haugh did say
that her husband would sign the deed, but the evidence fails
to show that she was authorized so to do. The record is
without any evidence that Haugh was satisfied with the
price agreed to; and his statement that he was not aware
of what his wife had done until long afterwards is uncon-
tradicted, save by what she may have said, in direct exam-
ination, when she swore that, in the month of June, he
agreed with her to sign the deed. But, upon cross-exami-
nation, she declared that he never did agree to sign it, and
Haugh swore that he had not so agreed; and it would seem
that the court was justified in accepting his statement as
true, in view of the circumstance that his wife had sworn
both ways, and that there was no other evidence bearing up-
on the question. The testimony was given in the presence
of the court; and, if precedents are to be followed, some
consideration should be given to the superior advantage
the trial court enjoyed in passing upon the credibility of
these witnesses. It is not to be pretended that his wife had
ever been authorized to represent Haugh. For the pur-
poses of this case, however, it might be conceded that Haugh
made the statement, as defendants claim, and that they act-
ed in reliance thereon; for there is no evidence of any con-
sideration's having subsequently passed in reliance upon
any promise of his to join in the execution of a deed or in a
sale of the land. At any time, before being acted upon, he
had the right to withdraw his promise or proposition. The

evidence is undisputed that, later in the year, and long before anything was done, defendants were aware that Haugh refused to join in the deed. Prior to such refusal, no consideration had been paid, and nothing had been done in pursuance of any oral statement or promise he may have made; and, therefore, the case is not within the exception to the statute of frauds found in Section 4626 of the Code. The windmill, spoken of in the pleadings, was not placed on the land until the fall of 1914. The interest on the $3,100 was not paid to plaintiff until long after the commencement of this suit, and long after Haugh's refusal to join in the deed.

But it is argued that the conduct of Haugh was such as to induce the defendants to enter into a binding contract for the purchase of Mrs. Haugh's interest in the land. If the attorneys' testimony is to be believed, and it is not contradicted, the deed stipulated in the contract was not to take effect until signed by Haugh, and "the mortgage was to be held back until the husband would sign the deed." As the execution of the deed by plaintiff and the execution of the mortgage by defendants were the only things stipulated in the contract, it is manifest that it was not to be binding unless Haugh signed the deed, and, therefore, that the majority is mistaken in its conclusion that a binding contract was entered into. Surely, neither party thereto could have enforced its provisions prior to the attaching of Haugh's name to the deed; and, therefore, neither party has been misled to his prejudice, and there was no estoppel. Haugh's conduct may not have been such as to meet the approval of the majority, and for the purpose of this case, he may be conceded to have been somewhat contumacious; but this does not warrant the majority in depriving him of his inchoate interest in this land. The mere fact that Haugh may be, in the opinion of the majority, a bad man, or naughty to his mother-in-law, ought not to deprive him of the full benefits of the law enacted for the protection of

one spouse in the other's property; and I am fully persuaded that the majority, rather than the learned judge of the district court, is committing an error, and I respectfully protest against the reversal of the decree dismissing the cross-petition of defendants.

It is argued, however, that specific performance should have been decreed against the wife, a portion of the purchase price being withheld, owing to the husband's failure to join in the deed. As the contract was for the conveyance of but an undivided fractional portion of the estate, I am inclined to the view that there was no abuse of discretion in refusing a decree of specific performance. In my opinion, the decree of the district court should be affirmed.

PRESTON and SALINGER, JJ., concur with this dissent.