C. F. NOBLE, Appellee, v. ELIZABETH R. B. TRUMP et al., Appellants.

**REFORMATION OF INSTRUMENTS:** Mistake—Degree of Proof
1 **Necessary.** He who seeks to reform the written evidence of a contract assumes a heavy burden. A mere preponderance of evidence on the issue of mutual mistake is not sufficient. The evidence must be (a) clear, (b) satisfactory and (c) free from doubt. Evidence reviewed, and *held* insufficient to show mutual mistake in the amount of land bought.

REFORMATION OF INSTRUMENTS:  Mistake—Knowledge of Con-
2  tents of Instrument.  One will not be heard to say that there
was mutual mistake in a contract signed by him without objec-
tion and with full knowledge of its contents.

*Appeal from Lucas District Court.*—D. M. ANDERSON, Judge.

FRIDAY, FEBRUARY 18, 1916.

ACTION to reform a written contract for the sale of land.
Judgment and decree for the plaintiff.  Defendants appeal.—
*Reversed* and *Remanded.*

*Stuart & Stuart,* for appellants.

*Hickman & Wells,* for appellee.

GAYNOR, J.—On the 17th day of January, 1911, the
defendants, Mrs. Elizabeth R. B. Trump and A. G. Trump,
husband and wife, were the owners of the following described
real estate, the West ½ of the Northwest ¼ of Section 6,
Township 71, Range 21; and on said day, entered into a
written contract with the plaintiff, the provisions of which, so
far as material to this controversy, are as follows:

"This agreement, made this 17th day of January, 1911,
between Elizabeth R. B. Trump and A. G. Trump, her hus-
band, of the county of Clark, and state of Missouri, party of
the first part, and C. F. Noble, of the county of Lucas, and
state of Iowa, of the second part, as follows:

"The party of the first part hereby agrees to sell to the
party of the second part, on the performance of the agree-
ments of the party of the second part, as hereinafter men-
tioned, all their rights, title and interest in and to the real
estate situated in the county of Lucas, and state of Iowa, to
wit:  The west one half of the northwest quarter of Section
No. Six, Township No. Seventy-one, Range No. Twenty-one,
containing 104.5 acres, more or less, for the sum of ten thou-
sand four hundred and fifty dollars, payable as hereinafter
mentioned.  And the said party of the second part, in the con-

sideration of the premises, hereby agrees to and with the party of the first part, to purchase all his right, title and interest in and to the real estate above described, for the sum of ten thousand four hundred and fifty dollars, and to pay said sum therefor to the party of the first part, his heirs or assigns, as follows: Five hundred dollars on the execution of this agreement, and the balance of ninety-nine hundred and fifty dollars in equal payments, to wit: $500 on March 1, 1911; $1,000 on May 12, 1911, and $8,450 on or before March 1, 1914, with interest from March 1, 1911, at the rate of six per cent. per annum on all such sums as shall remain unpaid, payable annually until all is paid.''

This contract was signed by plaintiff and defendants. Between the date of execution of said contract and the 1st day of April, 1912, the plaintiff paid, and there were endorsed on the contract, several items of payment and the date of the payment, amounting in all to $10,000. This would leave a balance due upon the contract of $450, with interest, as provided in the contract. On the 1st day of July, 1912, after those payments were made, the plaintiff served upon the defendants the following notice:

''You are hereby notified that I have deposited with the clerk of the district court of Iowa, in and for Lucas County, the sum of seven hundred fifty-eight and ninety-seven one-hundredths dollars as balance due on real estate contract executed by us on the 17th day of January, 1911, wherein you contracted to convey to me by warranty deed, and deliver abstract of title at the agreed price of $100 per acre, one hundred four and one-half acres in west one half of northwest quarter of Section six, Township seventy-one, Range twenty-one, in Lucas County, Iowa. That I have had said land surveyed according to the understanding had on the day of sale, and find that there are but 102.5 acres in said tract of land. I therefore demand that you deliver to said clerk of said court, or to me personally, sufficient warranty deed and abstract of title, and that you accept said sum of money so deposited in

full satisfaction of the balance of purchase price of said land.''

This $758.97 was claimed to be the balance due, with interest, on the contract, and was figured on the theory that the plaintiff had purchased and agreed to pay for only 102½ acres, instead of 104½ acres, as provided in the written contract. On the 12th day of March, 1914, plaintiff commenced this action to reform the written contract, claiming that the written contract did not express the true agreement between the parties; that the actual contract entered into, and which should have been reduced to writing, and which the writing does not express, was as follows:

''In consideration of $100 per acre, to be paid in installments, we, the defendants, hereby agree to sell, and by warranty deed to convey, to the plaintiff, all that part or portion of the W. ½ of N. W. ¼ of Section 6, lying east of the center of a highway running north and south on and along the west side of said tract of land, it being understood and agreed that defendants shall cause said tract of land to be surveyed to ascertain the number of acres therein, and plaintiff shall only be required to pay $100 per acre for the number of acres in said tract, as shown by said survey.''

This is the contract which the court in its decree found was actually made between the parties, and reformed the written contract so as to make it express what was claimed by the plaintiff, and found by the court to be the actual contract entered into between the parties. The record shows that the land referred to in the contract was surveyed later and found to contain 104½ acres. It was found that there was a road along the west part of this land, all upon this land, and that there were in this quarter, east of the middle of the road, only 102½ acres. This controversy, then, turns on whether or not the plaintiff had obligated himself to purchase and pay for the whole, including that occupied by the road, or whether he purchased and was only to purchase and pay for the land to the center of the road, leaving the west half of the road, though on the land described in the contract, the

property of the defendants. The plaintiff claims that he purchased only to the middle of the road, and that up to that point, the land purchased contained but 102½ acres; that he purchased it at $100 an acre, the number of acres to be ascertained by actual survey. This quarter was known to be fractional. The defendants claim that plaintiff purchased the entire fractional quarter, containing 104½ acres, more or less, for a specified sum, to wit, $10,450.

It appears that, at the time the written contract was made, neither party had definite knowledge as to the actual location of this road. Each knew of the existence of the road and that it was a used road. If defendants'

1. REFORMATION OF INSTRU-MENTS: mistake: degree of proof necessary.

contention is right, and the written contract is in force, the plaintiff purchased the whole fractional quarter, consisting of 104½ acres, including that occupied by the road and subject only to the easement. The record discloses that, at the time this written contract was made and signed by the defendants and the plaintiff, the contract was read over to the plaintiff before the same was signed by him. He was asked this question: "You signed the contract, knowing that it contained that statement, 'So many acres, more or less, for the sum of $10,450?'" He answered "Yes". There is no evidence at all in this record that the scrivener who drew the deed "by inadvertence or mistake" wrote the description of the land and the terms of the sale, as set out in the written contract, or that the written contract, as set out, is not the contract then agreed upon. There is no evidence that the plaintiff inadvertently signed the same. There is no evidence "that the contract is the result of fraud on the part of the defendant, A. G. Trump, and mistake and inadvertence on the part of the plaintiff", as claimed by the plaintiff in his pleading. These were affirmative allegations upon which the plaintiff predicates his right to have the written instrument, evidencing the contract, reformed so as to make it speak other and differently from that which its plain wording indicates. Unless this writ-

ten contract is reformed, the plaintiff has no standing in this court. He has not complied with, nor does he claim to have attempted to comply with, the provisions of the written contract in the payment of the full amount therein stipulated for. This case is triable *de novo* in this court upon the record made in the court below. We are not bound by the finding of the trial court upon questions of fact as we are by the verdict of a jury, even though there may be a dispute in the evidence upon controverted facts.

It is elementary that one who seeks to reform the written evidence of a contract assumes a heavy burden, and courts are not disposed to set aside written instruments, solemnly entered into, and substitute therefor another and a different contract from that expressed in the writing, except where it is made to appear that a written instrument does not express the true contract entered into between the parties, and that there was a mutual mistake in reducing the actual contract to writing, or that the party was circumvented by fraud from knowing and understanding the import of the written instrument signed. The evidence shows that the contract was prepared while plaintiff was present; that it was read over to him, and, after being fully read, was signed. He said he knew its contents, and its provisions. There is no evidence of any mutual mistake; no evidence that he was circumvented or in any way prevented from knowing and appreciating just what the written instrument said. The general rule is that, before a written instrument can be reformed on the ground that there was a mistake in drafting, the evidence that there was a mistake should be clear, satisfactory, and free from doubt. See *McTucker v. Taggart,* 29 Iowa 478; *Strayer v. Stone,* 47 Iowa 333, 336; *Wachendorf v. Lancaster,* 61 Iowa 509; *Bowman v. Besley,* 122 Iowa 42. It is elementary that fraud is never presumed, but must be established by the one relying upon it, to defeat a written contract.

It appears that, prior to the time when this written contract was entered into, the defendants had put this land up

for sale at auction with other lands; that the plaintiff was there and bid this land in at $100 an acre; that this sale did not go through; that, afterwards, McMains, who was the auctioneer, told the Trumps that he thought he could sell the land at private sale to the same parties who had bid on it. It appears from his testimony that, at the time of the sale to plaintiff at auction, it was estimated that it contained 104½ acres; that after McMains had his talk with Trump, in which he said he thought that he could sell it at private sale to the same parties who had bid on it, he had a talk with the plaintiff, and plaintiff said he would take it at the price he bid. "I told him we would try to sell it, and let him have it at $100 an acre. He said he would take it at that. I reported it to Trump and he agreed. I told Trump that he would give $100 an acre." He says further that, when they went to the office of the scrivener to draw up the contract:

"Mr. Noble wanted to know how the road was, and I told him, 'You bought enough land to know that a man buys to the middle of the road'. Q. What did he say. A. He said, 'Yes, sir'. I don't remember there was anything said about having the land surveyed. Trump was not present when I made the sale. He was present when the contract was drawn up. I was not authorized to close any deal. Noble made an offer and I reported it."

The plaintiff testified:

"After the auction sale had failed to go through, I met Mr. McMains about January 1st. He wanted to know if I would buy the land. I told him I would take it at what I offered for it. He said, 'There may be a chance for you to get it.' Afterwards, he asked me if I would raise the bid. I told him I would not. I looked the land over before the sale. Afterwards, he asked me to come up to the scrivener's office, that afternoon, and we closed up the deal. I had been dealing in land for some years, and found it was difficult to find some of the government corners. Some of the fractional

pieces would overrun; therefore, I insisted on having it surveyed. When my time came to settle, Ed Anderson, Mr. Trump and the lawyer (meaning the scrivener who drew the contract) were present. Says I, 'Is there any certainty in the acreage of this?' The lawyer says, 'The original survey says 104½ acres.' Says I, 'Does that mean to the center of the road?' Mr. McMains said, 'You have bought land enough to know that you have to buy half the road.' I made the statement that I was willing to pay for it, or that I wouldn't have it removed for a certain amount, something like that. Then I insisted that it be surveyed. I said I must have it surveyed, then I will know just what I am getting—the exact number of acres. I was to pay $100 an acre according to acreage. Mr. Trump said to the lawyer, 'Can you get a surveyor?' He said, 'Yes, sir.' Then he says, 'Get it surveyed.' He didn't say, 'Get the lines,' but just, 'get it surveyed,' and I never thought until July, 1912, but what that was the understanding, that I should pay for the acreage to the center of the road, not knowing that all the road came off me. I never would have signed the contract if I hadn't expected to get just what I paid for by the acre, up to the center of the road, not knowing that the road was off me at the time.''

He further testified:

''After they had failed to make a sale at auction, McMains called on me and asked me if I would buy that as I had bid at the auction. After some conversation, he told me he thought the matter would be arranged, and asked me to come over to Fancher's office. I went there. I think Fancher drew the written contract. I think Mr. Trump asked him to draw the contract.''

He was asked this question:

''What did he tell him was the contract? A. I don't recollect. I reckon he knew just as much about it as Trump did. He heard all the conversation. Q. The contract was presented to you? A. Yes, sir. Q. You read it? A. I rather

think Mr. Fancher did. I have not the least recollection, but it would be reasonable to suppose that he did. He said he signed the contract after Fancher read it. Q. Did you make any objection to it? A. No, sir, not with the understanding that I had that it was going to be surveyed. Q. For the sum of $10,450? A. Yes, sir, I suppose so. If it had been 110 acres, I would have been willing to pay it. Q. You signed the contract knowing that it contained this statement without objection? A. Yes, sir. I knew the road was there, but I didn't know it was all on the tract I bought."

Witness Ed Anderson testified that he was present at the time the contract was made. Noble said to Fancher that he wanted it understood that he was buying to the middle of the road.

"Q. What did Fancher say to that? Did he make any reply? A. I don't know. He made this statement on the day the contract was made. I could not say whether it was before or after the contract was written."

This is all the evidence, except some talks which plaintiff claims to have had with Fancher long after the making of the contract, and at a time when the record does not disclose that Fancher, the scrivener who drew the contract, was acting in any way for the defendants, or had authority in any way to bind them by what he said. It is apparent, then, that the plaintiff's contention is not that he was deceived into signing this contract, but that he had entered into a different oral contract from that embodied in the writing. The plaintiff therefore assumes the burden of proving that the contract actually entered into was as claimed by him, and not as expressed in the writing. It is not sufficient to show that the writing does not express something which the plaintiff understood to be a part of the contract, but that an actual contract was made and intended to be embodied in the writing and expressed in the writing at the time they undertook to reduce their contract to writing, and that this oral contract was, by

mutual mistake or inadvertence, or fraud of the other party, not expressed in the writing. When parties enter into a contract and reduce the contract to writing, it is presumed that the contract contains the agreement between the parties, and that all previous talks and agreements are merged in the writing, and that the writing expresses the contract upon which the minds met. See *Hoyer v. King,* 101 Iowa, 363.

In *Jurgenson v. Carlsen,* 97 Iowa 627, an action was brought for judgment upon a note, and to foreclose a mortgage given to secure it. The defendant pleaded a mistake in the note and mortgage, and asked that the same be reformed to conform to the understanding of the parties. The court said:

"The evidence is in conflict on the issue of mistake. It is well understood that, in such cases, the burden is upon him who claims mistake to establish the same by clear and satisfactory evidence, which shall be free from reasonable doubt. Now, while the scrivener who drew the instruments states that it was the agreement and understanding of the parties that the interest should mature and be paid with the installments of principal, and that he intended to make the note so read, and the defendant . . . also testified that this was the understanding, yet the defendant says that he heard the instrument read before he signed it, and was satisfied with it as read. He also says on cross-examination that there was no such understanding as he now claims, before he signed the paper. The plaintiff denies there was any mistake, and says that, when the papers were read to Carlsen, he expressed himself satisfied therewith. It also appears that defendant made no claim of mistake until about the time the answer was filed, but told a disinterested party that his defense to the suit would be that the plaintiff had failed to notify him that the interest was due. There is not such clear and satisfactory evidence in the case as to justify a reformation of the instruments."

In the case at bar, it appears that the writing was read

over to the plaintiff; that he had full knowledge of and under-stood its contents; that he signed it without any objection to the instrument as drawn, or to its provisions; that he made no complaint until he served the notice on the defendants hereinbefore set out; that he had then paid $10,000 upon the contract. There is no question, we will say, in this record, that the plaintiff desired the land surveyed; that the land was fractional, and, upon survey, was shown to contain 104½ acres—the exact amount of acres stated in the written contract. It was not known by the plaintiff or the defendants definitely then that the entire road was upon the land conveyed. Plaintiff said, at the time the contract was made, that he wouldn't have the road taken off for twice its value. His attention was specially called to the road. The only contention that the plaintiff can make, touching this contract, is that he was to buy but one half of the road upon the land purchased. He does not now claim that he purchased all the land covered by the description in his contract, but says that he purchased all that portion of the west half of the northwest quarter, etc., lying east of the center of the road, along the west side thereof. He does not claim that he purchased it all, and by agreement was to pay only to the center of the road. This would present a different question.

2. REFORMATION OF INSTRUMENTS: mistake: knowledge of contents of instrument.

In determining the weight to be given to the evidence, it is essential that we consider the reasonableness or unreasonableness of the claims made. It would not strike the mind as reasonable that the defendants, owning this entire fractional piece of land, should in the conveyance reserve to themselves a strip 30 feet wide along the west side. It does not seem reasonable that the plaintiff should have purchased, with the understanding that the defendants should retain, subject only to the easement, a strip 30 feet wide along the west side of this land. The conversation testified to, in which McMains is claimed to have said to the plaintiff, "You have purchased

enough land to know that you only have to pay to the center of the road'', unquestionably had reference to    conditions where the road was upon the section line, each abutting owner owning to the middle of the road, subject to the easement. There is no dispute, although there is some evidence offered tending to suggest a dispute, that the plaintiff was to pay $100 an acre for this land.    There is no dispute that the land described contained 104½ acres.    The only controversy is as to whether or not the defendants reserved a strip containing two acres off the west side of the land.    The evidence offered to reform the contract does not have that persuasive force that the law requires before a court of equity is justified in reforming a written instrument, where it was understandingly entered into between the parties, and substituting therefor an entirely different contract from that expressed in the written contract. To justify a decree reforming a contract on the ground of fraud, the evidence must be clear and satisfactory.    A mere preponderance is not sufficient.    To allow the reformation of a written instrument involving title to land, on the ground of mistake or inadvertence or fraud, the proof must be clear and satisfactory.    Any other rule would be dangerous to follow and tend to weaken confidence in titles and in written agreements.    See *Frey v. Camp,* 131 Iowa 109; *Johnson v. Farmers' Insurance Co.*, 126 Iowa 565; *Tufts & Colly v. Larned,* 27 Iowa 330.    In this case it is said:

"This writing ought to be accepted as a full and correct expression of the contract of the parties until the contrary is established beyond fair or reasonable controversy; and if the proofs are doubtful and unsatisfactory or if the mistake is not plainly shown, equity will not interfere."

Indeed, this is the universal holding of this court upon this proposition.    Many authorities might be cited in support of it.    See, further, *Hervey v. Savery,* 48 Iowa 313; *Clute v. Frasier,* 58 Iowa 268.

We think the record in this case fails to show that quantum of proof sustaining plaintiff's contention to justify the

decree of the court from which this appeal is taken. We find that the written contract, therefore, must stand as the expression of the agreement actually entered into between the parties, and that plaintiff's petition, in so far as it asks for a reformation of the contract, ought to be, and is, dismissed.

The cause is therefore reversed and remanded for decree and judgment in accordance with this opinion.—*Reversed* and *Remanded.*

EVANS, C. J., LADD and SALINGER, JJ., concur.