GALVA FIRST NATIONAL BANK, Appellee, v. OSCAR REED et al., Appellees; TABITHA JANE GRAY, Cross-petitioner, Appellant.

October 25, 1927.

Rehearing Denied January 13, 1928.

*Prichard & Prichard,* for appellant.

*C. E. Cooper,* for plaintiff, appellee.

*Parsons & Mills,* for intervener, appellee.

WAGNER, J.—The notes and two mortgages securing same which are the foundation of this suit were executed unto the Farmers Trust & Savings Bank of Castana, by the defendant Oscar Reed, the record owner of the real estate described in the mortgages; and one of said mortgages has been assigned to the appellee Galva First National Bank, and the other to the intervener, War Finance Corporation. The notes and mortgage held by the appellee Galva First National Bank were executed February 1, 1921; and the note and mortgage now held by the intervener, War Finance Corporation, were executed November 7, 1921. The decree rendered established the mortgage of appellee Galva First National Bank as a first lien upon the real estate, and that of intervener, War Finance Corporation, as a second lien upon the real estate, and denied any relief to the cross-petitioner, Tabitha Jane Gray. The real estate incumbered by the said two mortgages is the northwest quarter of the northeast quarter and the northeast quarter of the north-

west quarter of Section 20, Township 83, Range 43. The cross-petitioner was formerly the owner of 160 acres of land, which included the 80 acres involved herein. On February 12, 1912, she executed unto her son, Oscar Reed, a warranty deed for the 160 acres. The deed does not contain any condition or stipulation of forfeiture, or for the re-investing of the title in the grantor. Concurrently therewith, and as a part of the same transaction, the grantor and grantee executed the following written contract:

"This agreement made and entered into this 12th day of February, 1912, by and between Oscar Reed, party of the first part, and Tabitha Jane Gray, party of the second part, witnesseth:

"That for and in consideration of the conveyance of the following described land, situated in Monona County, Iowa, to wit: the west half of the northeast quarter and the east half of the northwest quarter of Section 20, Township 83, Range 43, by the second party to the first party, first party agrees to assume and pay all mortgage incumbrances and other liens against said land and to pay all other debts owing by second party at this time and also to furnish second party $2.00 per month cash and all care and support that she may need during the remainder of her life. And also all her personal property.

"And in consideration of first party's agreeing to assume and pay all indebtedness owing by second party, including mortgages, incumbrances and other liens against said land, and to furnish all care and support needed by second party during her lifetime, second party hereby agrees to convey to first party said land above described. And also all my personal property."

In her cross-petition, Tabitha Jane Gray alleges, in substance, her ownership of the 160 acres on the 12th day of February, 1912, and that, at that date, she entered into an oral agreement with Oscar Reed, in which it was agreed that she should deed to him said real estate, conditioned that he should pay all her indebtedness, and support and care for her during her natural life, and that, in the event that he should fail to carry out the terms of said agreement, then the deed was to be canceled and held for naught; and that the deed should contain such covenants as would protect her in the premises; that, as a part compliance with said oral agreement, she and

Oscar Reed entered into a written contract (being the one hereinbefore set out); that she was unable to read or write, and did not know the contents of the written contract, excepting as she was told, and did not know the contents of the deed, but supposed that they contained the covenants according to their oral agreement; that, by mutual mistake, the deed executed by her to Oscar Reed did not contain the provisions that said deed was given conditionally upon the performance of the terms of the oral contract; and that the written contract did not set out the conditional terms of the conveyance or a statement that said contract and deed should be canceled and held for naught if he failed to comply with the terms of the oral contract; that Oscar Reed has failed to support her. She asks that the petition of appellee Galva First National Bank and the petition of intervention of the War Finance Corporation be dismissed, that the title to the real estate be quieted in her, and for such other relief as may be deemed equitable.

In the replies of the appellees to the cross-petition, estoppel is pleaded; but since there is no evidence of estoppel in the case, said allegations will be disregarded.

The appellees in their replies deny the allegations of the cross-petition, and the appellee Galva First National Bank also avers in its reply that, in the event the court should find that the claim of the cross-petitioner, Tabitha Jane Gray, should be maintained, then, and in that event, it would and should be entitled to subrogation in the amount of $4,000, which amount of its money the evidence shows was used to pay off a prior mortgage which was upon the real estate at the time of the execution of the deed by cross-petitioner to Oscar Reed.

The aforesaid deed from cross-petitioner to Oscar Reed was filed for record, indexed, and recorded on the 15th day of February, 1912. The contract hereinbefore quoted was not recorded and not acknowledged. While the record does not show that the appellees are not innocent purchasers for value, or are not claiming through a purchaser for value without notice, it does not show that they are such. In so far as the determination of this case is concerned, the appellees stand in the shoes of the assignor, the Farmers Trust & Savings Bank of Castana. Of course, if, under the record, the cross-petitioner cannot prevail over Oscar Reed, neither can she as against the

Farmers Trust & Savings Bank or its assignees. Her contention is that not all of the terms of the oral contract were ingrafted into the written contract and deed, and that a condition providing that, in the event the grantee, Oscar Reed, should fail to pay all of her indebtedness and support and care for her during her natural life, the conveyance should be held for naught, should have been inserted in the deed; that it was omitted therefrom by mutual mistake of herself and her grantee. It is clear that she cannot prevail unless, under the record, she is entitled to a reformation of the instruments executed on the 12th day of February, 1912. While she does not specifically pray for reformation, yet she is entitled to no relief without reformation. It is manifest that the oral negotiations and agreement between the cross-petitioner and the grantee, which include the very subject-matter of the written contract and deed, and which were entered into the same day or the day before the execution of the aforesaid written contract and deed, were necessarily merged therein.

''It is frequently said that a written contract merges all prior and contemporaneous negotiations on the subject, together with all prior oral contracts, * * * but this is in effect a statement, in different form, of the rule excluding evidence of prior or contemporaneous oral agreements to contradict or to modify a written contract, based on the presumption that, in the absence of accident, fraud, or mistake, the whole engagement of the parties is expressed in the writing.'' 13 Corpus Juris 597.

However, parol evidence is admissible, but only to prove fraud, accident, or mistake, and thereby to impeach the contract. If the parol evidence, when introduced, is insufficient to prove fraud, accident, or mistake, the contract will stand, and will be enforcible according to its terms, regardless of the parol evidence. *Blumer v. Schmidt,* 164 Iowa 682.

The cross-petitioner alleges mutual mistake, as between herself and her grantee. Is the evidence sufficient to warrant reformation? In order to justify a reformation of a written instrument on the ground of mutual mistake, no mere preponderance of the evidence is sufficient; but the evidence must be clear, satisfactory, and convincing,—and some of the authori-

ties add, "free from reasonable doubt." *Noble v. Trump*, 174 Iowa 320. This court there said:

"To justify a decree reforming a contract on the ground of fraud, the evidence must be clear and satisfactory. A mere preponderance is not sufficient. To allow the reformation of a written instrument involving title to land, on the ground of mistake or inadvertence or fraud, the proof must be clear and satisfactory. Any other rule would be dangerous to follow, and tend to weaken confidence in titles and in written agreements."

In *Tufts & Colly v. Larned*, 27 Iowa 330, it is said:

"This writing ought to be accepted as a full and correct expression of the contract of the parties until the contrary is established beyond fair or reasonable controversy; and if the proofs are doubtful and unsatisfactory, or if the mistake is not plainly shown, equity will not interfere."

Many authorities could be cited, showing that this is the universal holding of this court.

In *Haugh v. Lanz*, 187 Iowa 841, it is said:

"To reform a writing on the ground of mistake, it must appear that there is a mistake in the writing, and the evidence to show this must be clear, satisfactory, and free from reasonable doubt. More than a mere preponderance of the evidence is required to sustain a decree for the reformation of a written instrument. It has further been said that a court will not disturb the provisions of a written agreement unless there is clear and convincing evidence that the instrument does not set forth the true intent of the parties, and that the failure to make it express such intent arose from oversight, or mistake in drafting. The general rule seems to be that the proof necessary must be almost sufficient to establish the right to a reformation beyond a reasonable doubt."

Another rule of law is that, in order to justify a reformation of a written instrument, the party asking the reformation must be free from negligence. *Pyne v. Knight*, 130 Iowa 113. In *Garner v. Johns*, 182 Iowa 684, it is said that the rule obtains in this state that, if by the exercise of reasonable diligence the complaining party might have ascertained the defect in an instrument complained of, he is bound thereby, being conclusively presumed to know its contents. In *Houchin v. Auracher*, 194

Iowa 606, wherein the complaining party was a person of defective eyesight, but signed the instrument without any effort whatever to learn its contents, though friends were present who would have read the writing, if requested, we held that he was not entitled to reformation, saying: ''Appellant was guilty of inexcusable neglect.''

With these rules of law firmly established, with reference to the reformation of instruments, let us consider the evidence as shown by the record. At the time of the execution of the written contract and deed, the cross-petitioner was a widow, living upon the 160 acres, heavily in debt. Oscar Reed, the grantee in the deed, was her son by a former marriage, and had lived with her for several years. She was unable to read or write, and, as stated in her cross-petition, knew nothing about the instruments, except as she was told. There is no claim made by her, and nothing in the record tending to show any fraud, trickery, sharp practice, or misrepresentation as to what the instruments contained. Her sole claim is that a portion of the oral contract was mistakenly omitted from the written contract and deed. She and her son talked the matter over with a neighbor, and the neighbor testifies:

''I talked with Mrs. Gray, all three of us together, and she agreed if he [the son] would support her and give her a home all her life, and so much money a week, she would sign him a deed, and he was to assume the indebtedness against the place. And it was further agreed that, if he did not comply with the *contract that was to be drawn up,* the land fell back to her.''

Oscar Reed testifies:

''I first talked with Struble [the neighbor], and then entered into an agreement. She agreed to deed me the land and give me a contract for the land, and I was to support her and take care of her as long as she lived, and bury her when she died, and if I failed to support her, she was to have the farm back. The contract should have contained what I have just stated.''

The cross-petitioner testifies:

''I told my son I would let him have the land, providing he would take care of me and give me so much a month, and if he didn't do that, the land was to come back to me. Afterwards, a contract was drawn up in writing, which I signed by

mark. I don't recall whether the agreement was to be put in the deed. I don't think so. Q. I think maybe you misunderstood me. Do you mean you didn't know whether it was put in the deed or not,—is that what you mean? Listen to the question now, as I put it: Was this agreement that you had with your son, was it to be put in the deed, so that you would know what it was? A. Yes.''

After the cross-petitioner and the son and Struble (the neighbor) had their talk, whatever it was, they sought a notary public, who made a memorandum of what they told him, and then the memorandum was taken to another party, for the purpose of drawing a deed and contract. The notary testifies:

''They wanted me to write down what they talked over. I wrote down a little understanding between them. There was a deed to be made to Oscar. I don't remember just exactly what was in the agreement. It was to be copied before it was to be signed. She told me that she was going to make a deed to Oscar, and she wanted to protect her rights. I don't remember what was written up. I read it over, and interlined a little. She could not read, and she wanted me to read it to her. She discovered that it didn't provide for any cash monthly payments, and they agreed that she was to have $2.00 per month. Then Oscar discovered that the personal property had not been put in, and I put that in. I signed the contract as a witness. I acknowledged the deed, and I presume that I must have read it to her.''

Struble testifies that he didn't hear the deed or the contract read, and that he doesn't believe that the deed was read to her. Oscar Reed testifies that he did not know what was in the written contract until awhile afterward. Neither he nor his mother, the cross-petitioner, was asked as to whether or not the deed and contract were read. The cross-petitioner testifies:

''I took some kind of a written contract, to show what he was to do for me.''

The son testifies that, when the place was deeded to him, there was an indebtedness of $8,000 on it, and that he had sold 80 acres, and paid $4,000 on the mortgage, and paid $500 of his own indebtedness. Since the time of the execution of the deed, and prior to the time of the execution of the two mortgages in suit, Oscar Reed has given numerous mortgages on the land in controversy. Oscar Reed also testifies that, out of the

$5,000 obtained at the time when he gave the mortgage now held by appellee Galva First National Bank, he paid a $4,000 mortgage which was on the land at the time he received the deed from his mother.

The cross-petitioner continued to live with her son on this farm until 1923, when she went to Oklahoma to a daughter, for her health, and according to the testimony of both the cross-petitioner and her son, he has not contributed to her support since said time, the mother testifying that she has received only $6.00 since that time.

According to the testimony of the son, the land is worth about $125 per acre. It is apparent that the sum total due on the notes secured by the two mortgages is about all the land is worth. We have set out the testimony quite fully. We must weigh the verbal testimony in the light of the surrounding facts and circumstances. In order to reform a written instrument for mistake, there must be " 'that measure or degree of proof which produces in the unprejudiced mind the belief and conviction of the truth of the fact asserted, having in view all the facts and circumstances surrounding the transaction.' " *Rensink v. Wiggers,* 99 Iowa 39. What the parties did, and did not do, in the premises, in the light of the surrounding facts and circumstances, as well as what the witnesses say upon the witness stand, is to be taken into consideration in determining the truth. Were the instruments read before signing? If not, since no fraud, artifice, trickery, or sharp practice to induce her signing the same is shown, the cross-petitioner, under the record of the case, is guilty of inexcusable neglect. If they were read, then the alleged mutual mistake has not been established by that quantum of proof required by the law to warrant a reformation. We believe from the record that the instruments were read before signing. No one testified that they were not read, Struble only giving his belief, and that he did not hear them read. The notary testified that, when the contract was read, both she and Oscar discovered slight changes which should be, and were, made; and the contract indicates that this is true. It is not reasonable to believe that, when the parties left the notary that day, they had not done exactly what they intended to do, and that the written instruments did not express their entire contract. The cross-petitioner permitted 80 acres of land

to be sold. There have been executed upon the real estate numerous mortgages, some of which must have come to her knowledge. While she claims that her son has breached his contract,—failing to give her any support for the last three years,—yet the record does not show that any complaint was made, and no action whatever was taken by her until the time of the litigation involving her son, when it became apparent that he, without her claim, would lose the farm. The son is a willing witness. It is apparent that, since he must lose the farm, he has a preference that it be lost to his mother, rather than to his secured creditors. Whatever interest the son has in the real estate has been conveyed, by way of security, to the assignor of the mortgages in suit.

If the cross-petitioner cannot prevail against her son, neither can she as against the assignees of the mortgages. She was heavily involved in debt at the time of the execution of the deed and contract. The son agreed to pay her debts, and she took back merely a simple contract from her son, by which she obligated himself to support her as long as she lived. The deed and the contract and the facts and circumstances surrounding the parties all point to this conclusion. The claim of cross-petitioner is not established by such clear, satisfactory, and convincing evidence as is required by the law to warrant a reformation.

The judgment and decree of the trial court is—*Affirmed.*

EVANS, C. J., and STEVENS, FAVILLE, and KINDIG, JJ., concur.