CHARLES E. WEST, Appellant, v. T. J. HYSHAM et al., Appellees.

No. 41229.

APRIL 5, 1932.

Ferguson & Ferguson, for appellant.

Hysham & Billings and Paul W. Richards, for appellees.

MORLING, J.—Plaintiff has been engaged in farming and draying. He had owned second mortgages to the amount of $35,000 or more, among which was one on 160 acres securing a note for $4500 given by Reed, subject to a mortgage to Annis & Rohling, for $15,500. Reed at the time in controversy was owing defendant bank more than $2,000. Since May, 1928, plaintiff had had a small checking account with defendant. In No-

vember, 1928, plaintiff borrowed of the defendant bank $400, to secure which he assigned the $4500 note and mortgage. The $400 note was renewed from time to time thereafter with his son Leon as surety, the bank retaining the collateral. On July 31, 1930, plaintiff left with the bank another renewal for $300, $100 having in the meantime been paid, but Leon did not sign the new $300 note. On August 21, 1930, Annis & Rohling wrote plaintiff, stating that there was $852.50 interest due and that the 1929 taxes were delinquent; that they were unable to get any response from the mortgagor; and that, unless the interest was promptly paid, they would find it necessary to go into the next term of court in foreclosure. On August 22, 1930, defendant wrote plaintiff, calling attention to Leon's failure to sign, and stating that the bank could not carry the renewal without Leon's signature, and unless it was obtained at once, defendant would have to cancel the renewal and collect the old note out of the collateral. On August 25, 1930, and again on September 1, 1930, plaintiff interviewed the cashier and assistant cashier of the bank in the presence of the stenographer, Miss Lyle. On each of those occasions plaintiff executed an assignment of the $4500 second mortgage (Exhibits 1 and 2). The suit is brought to reform these assignments. The disagreement of the parties is as to what was said on the dates the assignments were executed. Plaintiff's testimony, in brief, is that when he wanted anything on business matters he consulted with defendant's cashier, Roberts, and assistant cashier, Iddings; that he was unable to pay the $300 note; that he went to the bank pursuant to the letter of August 22nd.

"I went in to see about the note, and they started a conversation by putting the question up about the taking of this mortgage over and making a collection. * * * what Mr. Roberts (cashier) said to me, as near as I can tell it, he says, 'If we can get an assignment of this, why it would help us collect, and we could use it as a club to collect our notes against Mr. Reed.' I said: 'That is all right, I am willing if I can have the money we can get out of my mortgage, I will do that.' There was nothing said about asking Mr. Reed to sell the farm. Mr. Roberts said he thought there would be some chance of selling it. * * * Mr. Roberts said they would make the collection the best they could

and give me my money and try and see if they could get enough to pay theirs off,—that is the way they could make the collection. By doing this they said it would help the bank get straightened out with the Reeds. They were talking about the $2,000 note that Reed owed the bank, and that is what they wanted to collect. Regarding the $300 note they said they would deduct that out and give me all the balance there was. Of course, as I said, 'if this don't work out, and you can not get rid of the mortgage, and get the money out of it, I will accept the mortgage back, and still owe the $300.' They said they didn't hardly think there would be any need of that. * * * They was to cancel it for me when I signed this mortgage over, and mark it paid. Of course they didn't give it to me just then, but they give it to me later. * * * Q. Was there anything said by Mr. Roberts or Mr. Iddings at that time as to what was to be done with that mortgage when you signed this assignment, Exhibit 1? A. Why they was to take it and use it to help collect their money from Mr. Reed, and if they could sell the farm, of course it would be all right, and they might have to foreclose on it. * * * They were going to pay me the balance of what was left out of it and pay me the balance,—that is the words they used. * * * Exhibit 2 is dated August 25th. * * * I think I signed that instrument on the second visit, on the first of September. * * * that I got my $300 note back. * * * When he handed the note back to me on September 1st, I made the remark that 'if this doesn't go through so that it's all right, I expect to have this note and mortgage back, and I will owe you the note.' * * * and he said he didn't think there would be any use, it would be all right. * * * In my opinion, a fair and reasonable value of that farm last August and September, I should judge, by the way land is priced and so on, that was selling or changing hands, was $130 or $140 per acre. * * * We didn't talk about there being $852.50 interest due and unpaid (on first mortgage). I had read the (Annis & Rohling) letter before I gave it to the bank. I understood the interest wasn't paid, and understood that the taxes were delinquent. * * * I understood that Annis & Rohling were about to begin a foreclosure suit * * * Exhibit 12 is an assignment in blank of this Reed mortgage, and was signed by me * * * on the 31st day of March, 1925. I had forgotten about that assignment. * * *''

Plaintiff further testifies that the purpose of signing the assignment August 25th ''was for to give them a chance to work with it, and then I told them I would sign it if they would give me the money that was left after it was sold,—that is, the mortgage,—done what they could do to sell it. Q. After paying your debt? A. Yes, sir.· * * * They was to cancel it for me when I signed this mortgage over and mark it paid. Of course they didn't give it to me just then, but they give it to me later. * * * Q. Now did Mr. Roberts and Mr. Iddings say anything to you about the effect of these two exhibits here, Exhibits 1 and 2, the two assignments? * * * A. I says to them that I would not read it, I would trust them it was all right, and I would sign it; but before I signed it I wanted an agreement with them if they collected my money I was to get it. They said, 'these assignments are all right,'—that is the way they worded it; that it was made for the purpose of giving them power to go ahead with this deal, to foreclose and collect * * * This mortgage * * * for the benefit of the bank and me and themselves on behalf of * * * the $300 note.''

The testimony of the cashier, assistant cashier and stenographer is substantially identical. The stenographer, Miss Lyle, testifies that plaintiff ''said he had got this letter from Annis & Rohling, and they wanted this interest and taxes paid, and he was unable to pay those amounts. * * * He said he could not meet the $300 note. He said, would they just take the $4500 note for his $300, as he simply could not pay it, nor make these payments mentioned by Annis & Rohling. Mr. Roberts said he would take the $4500 note for the $300 note. Mr. West said that would be agreeable to him. Then Mr. Roberts handed me the old assignment of mortgage that had been signed in 1925, and told me to make up a new one of this date, and a release, and I made those up. Exhibit 1 is the paper that I then made up. * * * Exhibit 1 was given to him to read, and he read it. I heard Mr. West testify that Mr. Roberts said to him in substance that he wanted the $4500 note and mortgage assigned to the bank in order that they could use it for a club against Mr. and Mrs. Reed. He didn't make any such remark, * * * at any time during the time he was in the bank. I heard Mr. West testify in substance that if he made this assignment to the bank it was upon the condition that the bank was to collect this $4500 note

and then pay the $300 note owing to the bank, and pay the balance to him. No such conversation occurred. I saw the $300 note there that day. It was on Mr. Schenck's desk, within the reach of all of us. Mr. West did not take the note away with him that day. It was discovered after Mr. West had left the bank. I was in the bank on September 1, 1930, at the time Mr. West came into the bank. * * * At that time, in regard to Exhibit 2, Mr. Roberts told Mr. West that he had another assignment made up, and he read it to him. We were all standing around Mr. Schenck's desk there * * * and Mr. West sat down to sign it, and he said at that time something like this, that that finished him with the $4500 mortgage, and Mr. Roberts replied, in substance, 'that is about the size of it, it surely does;' and then, after he had signed it and I took his acknowledgment,— you see it had August in here in the acknowledgment, and I had to take it to * * * change it to September * * * I heard Mr. West testify in substance in his evidence that Mr. Roberts wanted an assignment of Exhibit 2 for the purpose of using it as a club against Anna K. Reed and Pearl Reed in regard to the $4500 note and mortgage * * *. Q. Did Mr. Roberts make such a remark? A. No, sir * * * I heard Mr. West testify in substance that if Mr. Roberts or the bank collected anything on the $4500 note and mortgage they were to take out sufficient to pay the $300 note and give Mr. West the balance, and heard him say the conversation took place on the first of September at the time and place I testified to. * * * No such conversation occurred.''

On September 15, 1930, the land was sold by Reed to Olson for $20,800,—$1500 cash, $15,500 by the first mortgage, $3800 March 1, 1931. The cashier testifies that plaintiff ''did not at any time or place, and particularly on the 25th of August, 1930, ever tell me that E. J. Olson might buy the premises described in the mortgage. I didn't know that Mr. Olson was interested in this quarter section at all until the 13th day of September, 1930. * * * I learned that the farm had been sold to E. J. Olson on the 13th day of September; I did not hear of it before that date, directly or indirectly.''

The assistant cashier testifies:

''I had no information, directly or indirectly, prior to Sep-

tember 13th, that Mr. and Mrs. Reed were selling the land referred to in the $4500 mortgage, or at any time that Mr. E. J. Olson was a prospective buyer of this land. Mr. Ed West (plaintiff) never had asked me for any advice regarding any business matter.''

The bank brought suit to foreclose the $4500 mortgage. Reed testifies:

''I had received some information regarding a transfer of this $4500 note and mortgage. I wanted to find out if he (plaintiff) had signed this over to somebody else. I asked him what he had did with the mortgage—the $4500 mortgage—and he said he had assigned it to the First National Bank for what he owed, and I had just talked to Mr. Hysham (defendant's attorney) before that, that is the reason I asked him, and he said he was out of it, and he was done with it. Mr. West said that. Mr. Hysham said he had started foreclosure, and that is the reason I went to Mr. West to find out if he had sold it, and he made the statement that he had. Mr. Hysham had told me that he owed a note to the bank, and I asked Ed (plaintiff) what it was, how much it was, and he said $300 and interest. He said he turned that over to pay that off. He said he had borrowed $400 in the first place, and that he had paid $100 on it, and then he turned this mortgage over to pay it. * * * Q. When first did you make any approach to Mr. E. J. Olson, who signed this contract of September 12th, with reference to selling the land to him? A. Well, after I had talked to Mr. West,—I could not say,—it was only a day or so afterwards. Q. And how long were you negotiating with Mr. Olson before you entered into this contract of September 12th? A. Four or five or six days. Q. And to whom did you communicate the information that you were negotiating with Mr. Olson? A. Paul Richards. Q. Did you communicate that to anybody else? A. No, sir. Q. Did you inform the First National Bank, or anybody connected with the bank? A. No, sir.''

Mrs. Reed testifies that she was present at the conversation between plaintiff and her husband, and gives substantially the same version of it. She says:

''I don't think we said anything to Mr. Olson about buying

the farm until after we heard they were going to foreclose on us. We hadn't tried to sell it to him until we found out that Mr. West said he didn't have anything more to do with the second mortgage; then we thought maybe he would buy it.''

Plaintiff denies these conversations. The Olson sale was financed through an account on the books of the bank, carried in the name of the cashier. The bank paid the delinquent interest to Annis & Rohling, $872.56, delinquent taxes, $222.65, attorneys' fees, $50, paid Reed in cash $761.65, cancelled his notes, $2,165.48. These, with plaintiff's note, $302.87, and the first mortgage, made up the purchase price of the land.

It must be remembered that this suit is not for cancellation of the assignments or for rescission of the agreement by which plaintiff's remaining interest in the mortgage was assigned to the bank. Plaintiff is standing upon the agreement. He has retained his $300 note. His contention is not that the agreement was void, but that it was different from that expressed in the writings. The assignment of August 25th was merely an ordinary assignment. That of September 1st recites:

''In consideration of the payment, cancellation and surrender of a certain promissory note for $300 (described) * * * I, Charles E. West, hereby sell, transfer, assign and set over to said First National Bank of Red Oak, Iowa, a certain note of $4500 (described) * * *.'' Also ''* * * mortgage given to secure said note (described) * * * I authorize said First National Bank * * * to collect, enforce and cancel said indebtedness and mortgage and retain as its own all proceeds therefrom.''

Plaintiff contends that the bank stood in a fiduciary relationship to him, obtained an unconscionable advantage of him, and has the burden of proof to establish good faith; that fraud will be inferred from the relationship and inadequacy of consideration.

As the suit is for reformation, and not for cancellation, these considerations are applicable only to the question of what the contract actually was, and whether the defendant, in reducing it to writing, fraudulently so phrased it that it did not express the true agreement. The agreement, as written, expressly states that the bank is ''to retain as its own all proceeds'' from

the mortgage. Plaintiff contends that, relying on defendant to draw it correctly, he did not read it. The record will not support a finding that he did not read it, or that it was not read to him, nor that he would be excusable if he did not read it or have it read to him. Crum v. McCollum, 211 Iowa 319.

It was incumbent upon the plaintiff, in order to secure a reformation of the contract, to prove that by mutual mistake or by mistake on his part and fraud on the part of the defendant the writing did not correctly express their actual agreement. The degree of affirmative proof required was not merely a preponderance of the evidence. The evidence "must be clear, satisfactory and convincing." Galva First National Bank v. Reed, 205 Iowa 7; Phillips v. McIlrath, 205 Iowa 1126; King v. Good, 205 Iowa 1203, 1209; Taylor v. Lindenmann, 211 Iowa 1122.

It is highly improbable that the bank officers should cancel, as they did, the $300 note and surrender it to plaintiff if the note was not paid. It is highly improbable that the two officers of the bank, in the presence of the stenographer, should agree with plaintiff to give back his $4500 note and mortgage if they did not collect it, and should immediately draw assignments in absolute form, one of them expressly stating that defendant was to "retain as its own all proceeds therefrom," and the plaintiff should then and there sign without questioning them. It is unreasonable that the bank, if it had made such an express agreement, would take the chance of personal liability by paying the proceeds to or for the benefit of Reed. It is reasonable that plaintiff was convinced that he could not protect the $4500 second mortgage and that cancellation of his note for $300 was better than nothing. Plaintiff's testimony to the alleged agreement is directly contradicted by all three of the witnesses present and indirectly by testimony of two witnesses to his contrary admissions.

The arguments adverse to the sufficiency of the plaintiff's evidence are too obvious and conclusive to call for further discussion.—Affirmed.

WAGNER, C. J., and EVANS, KINDIG, and GRIMM, JJ., concur.