FLORENCE FISCHER, Appellee, v. JAMES BOCKENSTEDT, Appellant.

No. 41522.

M. X. Geske, for appellee.

Alex Holmes, for appellant.

BLISS, J.—The plaintiff-appellee, a widow, was, with the assistance of her minor son, and of the defendant as hired man, operating her farm. The plaintiff was reluctant to pay the defendant the wages he asked, and it was proposed that the latter buy the personal property on the farm and occupy it as a tenant. This was on June 28, 1927.

To better inform themselves as to the value of the property, appraisers were selected. The defendant's brother acted for him. The property appraised was valued at $3,200.00. A tractor and certain equipment used with it, consisting of a disk, two-bottom plow, feed mill and belt, tractor binder hitch, and corn plow, were not appraised. The household goods, certain firewood and the planted corn were not appraised, also some wool, ducks, geese, chickens, four sheep, hog mineral and three of the seven horses were not appraised. The tractor and appurtenant equipment was not appraised because the defendant's father and brother stated that the defendant had no particular desire or use for it. The defendant was not present at the appraisal, but called upon the plaintiff with a typewritten copy which he had had made from the memoranda given him by his brother. Plaintiff had added the tractor outfit to the list at a valuation of $500.00, making the total appraisal $3,700.00. She testified that defendant told her to strike off the tractor item and that he would give her $3,000.00 for the listed property. Her fiancé corroborates her in this. The defendant testified that plaintiff had added the tractor outfit to the list at a valuation of $500.00 and that he did not ask that it be stricken, but stated that the valuations set out in the list were too high and that he would make a flat offer of $3,000.00 for all property on the place, excepting the household

goods and the plaintiff's personal belongings and her share of the growing corn and certain firewood.

Both parties concede that the amount agreed upon was $3,000. The disagreement is as to what property was sold.

The next morning, the plaintiff and her fiancé, acting as her adviser, and the defendant and his uncle, went to the office of Attorney C. J. Murphy, of Elkader, to draft a combined instrument evidencing the sale of the personalty and the lease of the farm. After obtaining the facts from information requested from, or volunteered by, his callers, the attorney called in his secretary and dictated to her the agreement. Before typing it, he had her read it to the four from her shorthand notes. Nothing was said by any of them about excepting the tractor outfit or any property but the household goods, personal belongings of the plaintiff, the corn in the field and some firewood. After the agreement had been typed, the attorney read it to all of them. Plaintiff's fiancé also read it himself. It was there signed and acknowledged by both parties. The attorney's version of the transaction appears from the following question and answer in his examination as a witness:

"Q. Give us, if you can, the details as to how exceptions were made and as to how you got the terms as to the personal property. A. Now, one of them,—I don't know which, they all talked,—but the gist of the conversation was, either Mr. Bockenstedt or Mrs. Fischer said they were about to rent the Fischer—Fred Fischer—I think it was the Fred Fischer—farm near Clayton, and that he was to have a lease on the place, and that he had purchased the personal property and would pay her for the personal property and then go on and farm the farm on an agreed rental. Now, when it came to the question of the personal property, they started in telling me the things that had been sold. Well, I remember this: I recall I asked, 'Mr. Bockenstedt got practically all of the personal property, didn't he?' And one of the group answered 'Yes.' 'But,' I said, 'there were probably some exceptions?' And they said there were. 'Well, now,' I said, 'to make a long story short, we will make out this lease covering a sale of all the personal property and then we will list the exceptions. That will probably be shorter.' So I went ahead and made the general provision and listed the exceptions, and *I recall distinctly that I asked two or three times whether this lease* covered everything that was in the agreement, and there was no question raised as to whether or not it did. It was given to the stenographer,

she wrote it, brought it back, I read it to the parties, they signed it before Mrs. Pesch [plaintiff] left the office."

The attorney is corroborated by the testimony of the four who were in the office. There is no dispute as to what took place in the office. Each party paid half of the fee for drawing the agreement. Plaintiff and her husband-to-be took plaintiff's copy of the agreement to her home, where each read it again that evening. She said she understood it.

The next morning, she sent the instrument for record. Defendant paid the purchase price by his check dated June 29, 1927, for $250.00, and his check for $2,750.00, dated August 1, 1927. Defendant took possession of the farm and all of the personal property thereon, with the exception of that specifically noted in the agreement on July 15, 1927.

About August 15th, the plaintiff sent her husband and son for the tractor outfit, but defendant would not permit them to take it. Plaintiff also demanded all of the other property which was not appraised,—the fleeces, ducks, geese, chickens, three horses, four sheep, hog mineral and potatoes in the ground. Defendant refused her, but she took the wool and the ducks and the geese. Plaintiff then brought a replevin action to recover the tractor and accompanying equipment, but not the other unappraised property. She sold the tractor outfit for $400.00.

Because of adverse rulings in the replevin action, she was forced to dismiss it. Her testimony in that action does not aid her cause in this. This action to reform the contract was then brought. The trial court granted the relief prayed for by reforming the contract so as to except therefrom the tractor and the various equipment above listed.

It would serve no good purpose to further set out the evidence. It was contradictory, and while the plaintiff produced three claimed disinterested witnesses who testified that the defendant, though a complete stranger to each, had volunteered the information that the tractor was not a part of his purchase, there are circumstances which weaken the force of their testimony.

Everything surrounding the transaction and the drawing of the contract was open and aboveboard. The parties were dealing at arm's length. The lower court held that there was no fraud. Neither did the plaintiff sign the contract, nor was she misled as to its con-

tents, by any artifice, concealment, trickery, or circumvention on the part of the defendant. There was no evidence of any inability on her part or on the part of her future husband to fully protect her rights in the matter. In fact, the record shows otherwise. Testimony of the attorney discloses that he inserted a clause in the contract that was solely for her benefit, and he informed her of that fact before she left the office.

Plaintiff relies solely upon the alleged mutual mistake of the parties, and contended and alleged in her petition "that the mutuality consisted in this: that it was an oversight on the part of both parties—inadvertence on their part; that the language used by the scrivener in drawing the lease and agreement was not closely scrutinized by them." The evidence to support these allegations does not meet the standard fixed by this court. The case is one of fact. There is no controversy as to the law. The only question is whether the plaintiff has sustained the burden upon her to establish her contentions by evidence of the character and amount requisite to reform a written contract.

We have characterized that burden as a heavy one, and have said that to warrant a reformation, the evidence must be "clear, satisfactory, and convincing" (Taylor v. Lindenmann, 211 Iowa 1122, 1127; Galva First National Bank v. Reed, 205 Iowa 7; Fitch v. Flinn, 198 Iowa 823, 826; McTucker v. Taggart, 29 Iowa 478); "clear, satisfactory, and free from reasonable doubt" (Haugh v. Lanz, 187 Iowa 841, 845; Pyne v. Knight, 130 Iowa 113; Noble v. Trump, 174 Iowa 320, 325); "More than a mere preponderance" (Haugh v. Lanz, supra; Noble v. Trump, supra). The parties seeking the reformation must be free from negligence (Galva First National Bank v. Reed, supra; Taylor v. Lindenmann, supra; Pyne v. Knight, supra; Garner v. Johns, 182 Iowa 684; Charlson v. Farmers State Bank of Lake Mills, 201 Iowa 120, 124.)

There has been no relaxation of the rule of these cases, and there should be none. Otherwise, the very purpose and advantage of a written contract would be defeated. As we stated in Turnis v. Ballou, 201 Iowa 468, 475: "As a precedent, such reformation would be a dangerous one, and the breeder of unlimited litigation."

The decree is—Reversed.

STEVENS, C. J., and EVANS, ALBERT, KINDIG, and CLAUSSEN, JJ., concur.